UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| In Re:<br><br>Carol Lott,<br><br>Debtor. | Bankruptcy Case<br>No. 17-40412-JMM |
|---|---|

### MEMORANDUM OF DECISION

**Appearances:**

Ryan E. Farnsworth, AVERY LAW, Idaho Falls, Idaho, Attorney for Debtor.

Thomas Daniel Smith, SERVICE & SPINNER, Pocatello, Idaho, Attorney for chapter 7 Trustee.

*Introduction*

In this case, the chapter 7[1] trustee, R. Sam Hopkins ("Trustee"), objects to the claim of exemption in certain future residual income of the debtor, Carol Lott ("Debtor"). Dkt. No. 34. Debtor responded to the objection. Dkt. No. 38. The Court thereafter conducted an evidentiary hearing on the matter on April 18, 2018, after which the parties submitted closing briefs. Dkt. Nos. 42, 47, and 50. Trustee's objection was then deemed under advisement.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION − 1

After considering the briefing, exhibits, and oral argument presented, as well as the applicable law, the Court issues the following decision which resolves the motion. Fed. R. Bankr. P. 7052; 9014.

## *Facts*

Debtor is employed selling insurance policies for American Family Life Assurance Company ("AFLAC"). This has been her employment for approximately five and a half years, after entering into an Associate's Agreement ("Agreement") with AFLAC on December 10, 2012. Ex. 200. Pursuant to the Agreement, when Debtor sells a new policy and the policyholder pays premiums during his/her first-year of coverage, Debtor receives a first-year commission. *Id.* at p. 9, ¶¶ 5.1- 5.2. She may choose to receive the first-year commission in one of two ways: she may receive the entire first-year commission in advance ("first-year advance"), or she may choose monthly commission payments ("first-year paid-as-earned"). *Id*. at ¶ 5.8. Debtor testified that she prefers to receive first-year advances, as it gives her a larger monthly income. However, if the policyholder elects to cancel the policy during that first year, then AFLAC deducts the unearned portion of the first-year advance from her check in the month the policy is terminated. *Id*. at ¶ 5.8.

If the policy is renewed after the first year, Debtor then receives monthly renewal commissions beginning in the thirteenth month after the effective date of the policy, and for all subsequent months that premiums are paid on that policy. *Id*. at p. 9, ¶¶ 5.1- 5.2. After AFLAC makes any necessary deductions, including for stock purchases as well as

MEMORANDUM OF DECISION − 2

for insurance, it then issues Debtor a monthly check that reflects her first-year commissions as well as renewal commissions, along with any bonuses she may have earned. Ex. 201 at pp. 4-d, 5-d, 6-d, 7-d, 8-d, 13, 19, 26, 33, 40, 47.

In order to receive the renewal commissions due, Debtor must comply with the terms of the Agreement and meet certain minimum requirements found therein. *Id.* at ¶¶ 5.2, 7.1. One of the requirements is that Debtor must have either $750 in annualized new policy premiums during the month, or she must have at least $10,000 worth of annualized new policy premiums for the calendar year. *Id*. at ¶¶ 6.1, 6.1.1, 6.1.4, 7.1. Debtor's commission statements indicate that, during the relevant time period,[2] she always exceeded the $10,000 sales threshold, except in January 2018, as explained below. Ex. 201; Dkt. No. 8.

Debtor testified that her business model involves selling new policies as well as supporting existing policies and clients through answering questions, helping to process claims, and maintaining contact and friendships. She frequently makes trips to visit clients at their offices, often bringing treats with her. She testified that without this continuing contact with clients, there would be significantly fewer renewals and correspondingly fewer renewal commissions. She offered anecdotal evidence that her renewal commissions are increased by as much as 50% due to her retention efforts.

---

[2] The time period the Court is examining is the petition date, May 11, 2017, through the date Trustee filed his objection, March 9, 2018.

MEMORANDUM OF DECISION − 3

Debtor filed her chapter 7 petition on May 11, 2017.  Dkt. No. 1.  As shown in the table below, her commission statements demonstrate that from May 2017 – March 2018, she received $5,577.04 in net first-year advances, and $227.59 in net first-year paid-as-earned commissions for pre-petition policy sales.  Finally, during those months, Debtor received $7,007.01 in net renewal commissions from pre-petition policies.

| Month | Net First-Year Paid-as-Earned[3] | Net First-Year Advances[4] | Net Renewal[5] | Net to Debtor[6] |
|---|---|---|---|---|
| May 2017 | 54.32 | 555.63 | 644.75 | 868.99 |
| June 2017 | 4.36 | 713.25 | 605.31 | 962.15 |
| July 2017 | 15.75 | 721.22 | 600.04 | 976.24 |
| Aug. 2017 | 13.70 | 286.17 | 604.34 | 496.85 |
| Sept. 2017 | 20.91 | 709.84 | 758.03 | 1,128.01 |
| Oct. 2017 | 29.41* | -43.45 | 616.23 | 251.56 |
| Nov. 2017 | 53.29 | 221.64 | 396.76 | 629.45 |
| Dec. 2017 | -8.81* | 1,299.91[7] | 719.29 | 1,492.74 |
| Jan. 2018 | 37.67* | 257.83 | 576.04 | 585.91 |
| Feb. 2018 | 1.90* | 462.07 | 713.18 | 924.52 |
| Mar. 2018 | 5.09* | 392.93 | 773.04 | 913.84 |
| Totals | 227.59 | 5,577.04 | 7,007.01 | 9,230.26 |

---

[3] The amounts in this column exclude any credits and debits for policies effective after the petition date.  All amounts marked with an * include a reduction of $10.14 for policies effective May 2017, the month Debtor filed her bankruptcy petition.  It is unclear whether those policies were entered into pre- or post-petition, so the Court has given Debtor the benefit of the doubt for those commissions and assumed the effective policy date is post-petition.

[4] The amounts in this column are reduced by first-year chargebacks.

[5] Because renewal commissions begin in the 13th month after the policy was written, all renewal commissions at issue are necessarily for policies written pre-petition.  Net renewals are reduced by any debits reflected on Debtor's monthly accounting statements.

[6] The table does not reflect miscellaneous debits or any bonuses paid to Debtor.

[7] Includes $106.16 in first-year net reissues.

MEMORANDUM OF DECISION − 4

Initially, in her schedules, Debtor claimed the future residual income from AFLAC, valued at $1,500, exempt under Idaho Code § 11-605(11). Dkt. No. 1. Trustee did not object to that claim of exemption, and thus it will be allowed. *See Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–44 (1992) (a bankruptcy trustee cannot contest a claim of exemption beyond the 30-day objection period under Rule 4003(b)). On March 1, 2018, Debtor amended schedule C to declare the portion she owned to be $4,449.96, and claimed 75% of it exempt under Idaho Code § 11-207. Dkt. No. 31. Trustee thereafter filed an objection. Dkt. No. 34.

*Arguments*

Trustee objects to Debtor's claim of exemption in certain of the post-petition AFLAC commissions. He argues that Debtor's future residual income from AFLAC renewal commissions as well as first-year commissions which were paid-as-earned for pre-petition policy sales are included in Debtor's bankruptcy estate, because Debtor did not have to perform any personal services to earn them.

Debtor argues that her renewal commissions are as high as they are as a direct result of the work she puts in. And as such, she concedes that while the June renewal commissions were likely the result of her pre-petition efforts, she contends that as each month goes by, less and less of the commission is the result of pre-petition work, and more of it is the direct result of her ongoing, post-petition personal work in servicing those accounts and maintaining those client relationships. Therefore, she argues that those renewal commissions are exempt.

MEMORANDUM OF DECISION − 5

*Analysis and Disposition*

The Court will first consider whether the respective commissions are property of Debtor's bankruptcy estate, and if so, whether they are exempt.

### *1. Property of the bankruptcy estate*

Pursuant to the Code, the bankruptcy estate created by the filing of a petition includes "all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1). The estate also includes all "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." § 541(a)(6).

Even though a debtor's pre-petition earnings may be subject to a post-petition contingency, those earnings may still be estate property. Recently, the Ninth Circuit Bankruptcy Appellate Panel held that "any contingent interest of the debtor sufficiently rooted in the pre-bankruptcy past is estate property, even if the contingency is not satisfied until after the bankruptcy is filed." *Anderson v. Rainsdon (In re Anderson)*, 572 B.R. 743, 747 (9th Cir. BAP 2017).

In *In re Anderson*, this Court held that commissions paid to the debtors post-petition for sales contracts entered into pre-petition were rooted in the pre-bankruptcy past and thus were property of the estate and subject to turnover. 558 B.R. 369, 374 (Bankr. D. Idaho 2016), *aff'd* 572 B.R. 743 (9th Cir. BAP 2017). The BAP held that, "[w]here the debtor receives a commission post-petition, but essentially fulfilled all of his

MEMORANDUM OF DECISION − 6

obligations for that commission pre-petition, the commission will be deemed property of the estate." *In re Anderson,* 572 B.R. at 748 (quoting *Tully v. Taxel (In re Tully)*, 202 B.R. 481, 483 (9th Cir. BAP 1996)). In other words, "a debtor's commission is property of the estate 'if all the acts of the debtor necessary to earn it are rooted in the pre-bankruptcy past.'" *Tully,* 202 B.R. at 483 (quoting *In re Sloan*, 32 B.R. 607, 611 (Bankr. E.D.N.Y. 1983)) (citing *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)).

In the event the debtor's services required to earn the fees were performed both before and after the bankruptcy filing, the estate is entitled to recover the portion of the payment attributed to pre-petition services, even though the payment is not made until after the bankruptcy filing. *Jess v. Carey (In re Jess)*, 169 F.3d 1204, 1207 (9th Cir. 1999) (discussing trustee's entitlement to debtor-attorney's contingent fees for cases settled after bankruptcy). In *In re Anderson,* a division of the commissions between pre- and post-petition efforts might have been made, however the debtor submitted no evidence from which the Court could determine such apportionment. *In re Anderson,* 558 B.R. at 375; 572 B.R. at 749.

There is case law guiding this Court on how to determine whether Debtor's post-petition commissions are estate property. In *Towers v. Wu (In re Wu)*, the debtor was an insurance agent who, like Debtor here, received commissions on first-year and renewal premiums. *Id.* 173 B.R. 411, 412–13 (9th Cir. BAP 1994). The trustee in that case filed an adversary proceeding in which he sought to avoid the payment of the renewal commissions and recover the value of those payments, and the issue was whether those

MEMORANDUM OF DECISION − 7

commissions were property of the bankruptcy estate, or subject to the post-petition earnings exception found in §541(a)(6). The BAP analyzed the commissions in this manner:

> [t]he proper analysis . . . is to first determine whether any postpetition services are necessary to obtaining the payments at issue. If not, the payments are entirely "rooted in the pre-bankruptcy past" and the payments will be included in the estate. If some postpetition services are necessary, then courts must determine the extent to which the payments are attributable to the postpetition services and the extent to which the payments are attributable to prepetition services. That portion of the payments allocable to postpetition services will not be property of the estate. That portion of the payments allocable to prepetition services or property will be property of the estate.

*In re Jess*, 215 B.R. at 620 (quoting *In re Wu*, 173 B.R. at 414–15) (internal citations omitted). The BAP continued:

> Where a debtor's post-petition services were not necessary to generate the renewal commissions because the terms of the contract continued to pay renewal commissions in the event that the debtor terminated the contract or died, courts have found the renewal commissions to be property of the estate. Where, however, the contract required a debtor to remain employed by the insurer and to service the existing policies or perform certain other services in order to receive the renewal commissions, courts have found that post-petition services were necessary to generate the renewal commissions and the commissions were not property of the estate.

*In re Wu*, 173 B.R. at 414 (internal citations omitted). Thus, "the courts have generally focused upon the rights and obligations of the debtor pursuant to the employment agreement and whether the receipt of the commissions was dependent upon the performance of postpetition services." *Id.*

MEMORANDUM OF DECISION − 8

Applying this analytical construct to the facts of the case at bar, the Court concludes that the right to receive renewal commissions existed pre-petition. In this case, no post-petition services were necessary in order for Debtor to receive renewal or first-year paid-as-earned commissions, except in the month of January 2018. The Agreement requires Debtor to produce either $750 in premiums on new policies each month, or have $10,000 in premiums on new policies each calendar year. When Debtor filed her petition in May 2017, she already had $58,295.06 in new sales premiums for the year. Ex. 201 at p. 4. Thus, she did not have to sell any more new policies in 2017 to be eligible to receive renewal commissions for that year. However, that figure reset as of January 2018, so Debtor had to sell at least $750 in new policies to receive her renewal commissions that month. The January 2018 commission statement, dated January 31, 2018, indicates that $4,715 in first-year premiums were collected that month, and she had $17,086.77 in force for 2018. *Id.* at p. 29. Accordingly, both thresholds were met in January, so she did not technically need to sell any more new policies in 2018 to be eligible to receive renewal commissions. Nevertheless, Debtor had to provide personal services in the month of January to entitle her to receive renewal commissions. As for the other relevant months, the Agreement requires only that it be in force, that Debtor not be in breach of its terms, that she meet the vesting and production requirements provided therein, that she maintain licensure, and that she remain employed

MEMORANDUM OF DECISION − 9

by AFLAC for paid-as-earned commissions.[8]  Ex. 200 at ¶¶ 5.2, 6.1.  In fact, pursuant to the Agreement, because Debtor has been with AFLAC for five years, if her employment with AFLAC is terminated, she is now vested such that she will receive 75% of the renewal commissions to which she is entitled for her life.  Ex. 200 at ¶¶ 7.1, 7.1.2.  Moreover, in the event Debtor dies while receiving renewal commissions, 100% of the renewal commissions would be payable to her heirs.  *Id.* at ¶ 7.3.  It appears that the only reason why Debtor would forfeit receiving renewal commissions is if the Agreement is terminated for a specified set of reasons, mostly involving illegal or otherwise restricted conduct.  ¶¶ 5.10, 8.1-8.4, 9.1(b)-(h).

In other words, under Debtor's contract with AFLAC, except for the month of January 2018, she technically does not need to take any action, beyond avoiding illegal and prohibited conduct, in order to receive the renewal commissions for policies she originally sold, and she need only remain employed by AFLAC to receive first-year paid-as-earned commissions.  Because no personal services were required on Debtor's part, any payments made pursuant to the Agreement were property of the estate, even though paid post-petition.  *Rau v. Ryerson* (*In re Ryerson)*, 739 F.2d 1423, 1425 (9th Cir. 1984).  Applying the foregoing, the Court holds as follows:

---

[8] No first-year paid-as-earned commissions are paid after termination of the Agreement or the associate's death.  *Id.* at ¶¶ 7.2-7.3.

MEMORANDUM OF DECISION − 10

As to **first-year advances**, Trustee concedes, and the Court agrees, that these are fully exempt. First-year advances result from either Debtor's pre-petition personal services, as they stem from the sale of an original policy as opposed to a renewal, or they are post-petition sales resulting from Debtor's personal services. For the month of May 2017, Debtor received $984.82 in first-year advances for policies sold that month. One policy, sold pre-petition, generated a $259.08 commission, which would be exempt under Idaho Code §§ 11-207 and 11-605(11) as earnings from pre-petition personal services that were earned but unpaid as of the date of filing. The remaining May 2017 first-year advances stem from post-petition sales of new policies, and thus also result from Debtor's personal services. This renders them not part of Debtor's bankruptcy estate under §541(a)(6).

As to **first-year commissions paid-as-earned**, these are the commissions on new policies that Debtor elects to receive as monthly payments, rather than as the advances discussed above. In the same light as the first-year advances, Trustee also concedes that first-year commissions paid-as-earned for policies first effective post-petition do not arise from Debtor's pre-bankruptcy past, so they are not estate property. However, as to those first year policies which were effective pre-petition but for which the commission is paid monthly, the payments made post-petition are estate property. This is because all of Debtor's personal services necessary to secure the insured's purchase of the policy were performed pre-petition, and therefore are rooted in the pre-bankruptcy past. The only contingency remaining for Debtor to receive the monthly portion of the commission is

MEMORANDUM OF DECISION − 11

that she needs to remain employed by AFLAC, and the policyholder needs to continue to pay the premiums.

Upon examination of Debtor's commission statements, it appears the $227.59 in net first-year commissions paid-as-earned for pre-petition policies are estate property.

Regarding **renewal commissions**, the Court holds that Debtor's renewal commissions for the month of January 2018 are not estate property because the Agreement required her to perform personal services during that month in order to meet the threshold sales required for eligibility to receive renewal commissions that month. Accordingly, the $576.04 in renewal commissions for January 2018 are not part of Debtor's estate.

The remaining renewal commissions are estate property because Debtor's personal services were not required to earn them. In so holding, the Court is mindful of the fact that Debtor nurtures her clients through diligent contact and personal customer service, going above and beyond what is expected of her. There is also evidence that her efforts pay off when it comes to customers' decisions about whether to renew their AFLAC policies. Nevertheless, *technically*, Debtor does not need to provide those services in order to earn her renewal commissions. *See Williams v. Tomer (In re Tomer)*, 147 B.R. 461, 472–73 (S.D. Ill. 1992) (debtor's entitlement to post-petition commissions is not contingent upon the performance of subsequent services when the contract provides that if the debtor terminates employment or dies, the payment of commissions would still be made.) Accordingly, excluding the $576.04 in renewal commissions attributable to

MEMORANDUM OF DECISION − 12

postpetition personal services, $6430.97 in renewal commissions are property of Debtor's bankruptcy estate.

### *2. Exemptions*

Debtor amended her schedule C to claim the future residual income from AFLAC exempt under Idaho Code § 11-207. In bankruptcy, a debtor may exempt certain property, thereby shielding it from liquidation by the chapter 7 trustee. *In re Cerchione*, 398 B.R. 699, 703 (Bankr. D. Idaho 2009). While the objecting party bears the burden of proving that a claimed exemption is not valid, *Id.* at 703, it is Debtor's burden to show that a commission results from post-petition services and is not estate property. *In re Anderson*, 558 B.R. 369, 375 (Bankr. D. Idaho 2016); *In re Lemos*, 243 B.R. 96, 98 (Bankr. D. Idaho 1999) (citing *Johnson v. Taxel (In re Johnson)*, 178 B.R. 216, 220–21 (9th Cir. BAP 1995)).

In Idaho, debtors are restricted to claiming exemptions provided for under state law. Idaho Code § 11-609. Under the earnings exception, "a debtor is allowed to keep any earnings generated after the commencement of the case, so long as the earnings can be attributed to personal services actually performed by that debtor." *In re Atkinson*, 258 B.R. 769, 774 (Bankr. D. Idaho 2001) (citing §541(a)(6)).[9]

Idaho Code § 11-207 provides:

---

[9] The analysis of earnings under §541(a)(6) and Idaho Code § 11-206(1) is the same. *Id*. at 773; *In re DeBoer*, 99.3 I.B.C.R. 101, 104 (Bankr. D. Idaho 1999) (quoting *In re Grewal,* 96.4 I.B.C.R. 146, 146 (Bankr. D. Idaho 1996)).

MEMORANDUM OF DECISION − 13

> (1) Except as provided in subsection (2) of this section, the maximum amount of the aggregate disposable earnings of an individual for any work week which is subjected to garnishment shall not exceed (a) twenty-five per cent (25%) of his disposable earnings for that week, or (b) the amount by which his disposable earnings for that week exceed thirty (30) times the federal minimum hourly wage prescribed by 29 U.S.C.A. 206(a)(1) in effect at the time the earnings are payable, whichever is less. In the case of earnings for any pay period other than a week, the Idaho commissioner of labor shall by regulation prescribe a multiple of the federal minimum hourly wage equivalent in effect to that set forth in (b) of this subsection.

Prior decisions of this Court have held that Idaho Code § 11-207(1) protects a percentage of the earnings owed to the Debtor that were accrued but remain unpaid as of the date of filing the petition for relief. *In re Atkinson*, 258 B.R. at 773; *In re DeBoer*, 99.3 I.B.C.R. 101, 102 n.3 (Bankr. D. Idaho 1999); *In re Grewal*, 96.4 I.B.C.R. 146, 146 (Bankr. D. Idaho 1996); *In re Sanders*, 91 I.B.C.R. 205, 205 (Bankr. D. Idaho 1991).

For the purposes of Idaho Code § 11-207, the statutory definitions, including that for "earnings," are as follows:

> 1. "Earnings" means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.
>
> 2. "Disposable earnings" means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld.
>
> 3. "Garnishment" means any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt.

Idaho Code § 11-206.

MEMORANDUM OF DECISION − 14

This Court has examined Idaho Code § 11-207 on numerous occasions. It has previously held that accounts receivable from a medical practice were exempt under that statute:

> [S]o long as the subject "receivable" was actually derived from the personal services of the debtor, it is exempt to the degree provided in the statute. The matter is, in the final analysis, one of proof of the facts surrounding the creation of the account receivable and to what extent the account receivable does or does not reflect compensation for personal services.
>
> * * * * *
>
> If the obligation is for the personal services and labor of the debtor, the Idaho legislature has provided for an exemption of 75% of that amount. It does not matter whether it is called compensation, salary, bonus, wage, commission, or "account receivable" so long as the factual predicate is established as a matter of record.

*In re Atkinson,* 258 B.R. at 773 (quoting *In re DeBoer*, 99.3 I.B.C.R. at 103–04). "Thus, the focus is not on the words used to describe the obligation, but rather on how the obligation was generated. If the obligation is found to reflect compensation for personal services and labor of the debtor, § 11–207(1) provides an exemption of 75% of that amount." *In re Atkinson*, 258 B.R. at 773.

The crux of the cases interpreting Idaho Code § 11-207 hold that the earnings must be the result of the personal services of the debtor. In the case at bar, the renewal and pre-petition first-year paid-as-earned commissions that were paid to Debtor post-petition are a function of the Agreement between Debtor and AFLAC, and the policyholder's continual payment of premiums. They are not, as discussed above, the result of Debtor's continued personal services. As such, the exemption found in Idaho Code § 11-207 is

MEMORANDUM OF DECISION − 15

inapplicable here and will not protect 75% of those commissions. Accordingly, Trustee's objection to Debtor's claim of exemption will be sustained as to all relevant months except January 2018.

*Conclusion*

As to Debtor's initial claim of exemption in the residual income from AFLAC under Idaho Code § 11-605(11), valued at $1,500, it is allowed because Trustee did not file an objection.

With regard to Debtor's claim of exemption under Idaho Code § 11-207, because of the pre-petition Agreement in place, Debtor was contractually entitled to receive commissions. With the exception of the $576.04 renewal commission earned in January 2018, the renewal commissions from May 2017 – March 2018 and the paid-as-earned commissions for those months are estate property. The first-year advances are not estate property. Moreover, Idaho Code § 11-207 protects none of the commissions that are part of Debtor's bankruptcy estate, as they are not the result of her post-petition personal services.

Accordingly, Trustee's objection to Debtor's claim of exemption is well-taken and is sustained as to the net first-year paid-as-earned commissions, and the net renewal commissions, with the exception of $576.04 in renewal commissions for January 2018, which are exempt. Trustee's objection is also denied as to $5,577.04 in net first-year advances, which are likewise exempt.

MEMORANDUM OF DECISION − 16

Those commissions that are property of the estate and are exempt are the following:

1. First Year Commissions earned pre-petition that are $227.59: 75% exempt under Idaho Code §11-207 is $170.69 and balance of $56.90 exempt under Idaho Code §11-605(11).

2. First Year Advances earned pre-petition that are $259.08: 75% exempt under Idaho Code §11-207 is $194.31 and balance of $64.77 exempt under Idaho Code §11-605(11).

3. Balance of $1,500 exemption allowed under Idaho Code §11-605(11) is $1,378.33 which can be applied to the net of $6,430.97[10] in pre-petition renewal commissions leaving $5,052.64 of bankruptcy estate property that is not exempt.

Debtor should therefore turnover $5,052.64 to the Trustee as the balance of the non-exempt property of the bankruptcy estate.

A separate order will be entered.



DATED: July 19, 2018

_____

---

[10] The total net renewal commissions are $7,007.01 during the applicable period but $576.04 of this amount have been determined to be earned postpetition leaving the balance of $6,430.97.

MEMORANDUM OF DECISION − 17

JOSEPH M. MEIER
U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 18